[No. 9102.    Department Two.    April 5, 1911.]

## K. W. SHAFFORD, *Respondent*, v. WHITE BLUFFS LAND AND IRRIGATION COMPANY *et al.*, *Appellants.*[1]

WATERS AND WATER COURSES — IRRIGATION COMPANIES — REGULATIONS. The obligations of an irrigation company in the arid district are *quasi* public, and arbitrary action in the guise of regulations will not be tolerated.

SAME—REASONABLENESS OF REGULATIONS. A regulation of an irrigation company providing for an intermittent rather than a constant flow of water cannot be declared unreasonable as a matter of law.

SAME—WATER CONTRACTS — REGULATIONS — CUSTOM — EFFECT. A water contract permitting an irrigation company to adopt reasonable rules and regulations, is not controlled by a custom in that locality to supply water in a constant rather than an intermittent flow, since the same depends on the irrigator's necessities and beneficial use.

SAME. A contract giving an irrigation company the right to make reasonable rules and regulations, where the water was furnished by pumping, cannot be controlled by the prevailing custom among users of a natural flow, so long as the company supplied the amount contracted for.

SAME—WATER CONTRACTS—MUTUALITY — CONSTRUCTION. A water contract providing for a certain amount of water per second of time for each 160 acres of land, subject to reasonable rules and regulations of the company as to the time and manner of delivery, is mutual

[1]Reported in 114 Pac. 883.

and to be construed in the light of the necessities of the parties, rather than their arbitrary desires; and a regulation providing for an intermittent flow is not unreasonable, as a matter of law, unless it did not give the amount contracted for.

Appeal from a judgment of the superior court for Benton county, Holcomb, J., entered May 4, 1910, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action for damages and equitable relief. Modified.

*Parker & Richards*, for appellants.

*Roberts & Udell*, for respondent.

CHADWICK, J.—Plaintiff took an assignment of a contract for the purchase of a tract of land, which contract had been executed by appellant White Bluffs Land & Irrigation Company. A payment was made on the purchase price, and annual payments were to be made thereafter until the full purchase price had been paid. The contract also called for the payment of an annual water rent. Respondent attempted to cultivate his land in 1908 and in 1909, but contends that his crops withered and died for the want of sufficient water to sustain them. He did not pay his water rents or meet his payments for the years mentioned, and as it is alleged, defendants have threatened to cancel his contract. This action was brought, asking for such remedy as would protect plaintiff in his rights as a contract holder, for the appointment of a receiver, that his damages for the years 1908 and 1909 be measured, that the amount thereof be credited upon his contract, and for such other relief as the equities of the case might show that he is entitled to. After a trial on the merits, a decree was entered, assessing plaintiff's damages in the sum of $50, which was ordered applied as a credit upon his contract, but denying his application for a receiver.

A somewhat voluminous record is presented, but we take it that the facts are not very material to the real inquiry. If so, we are inclined to follow the judgment of the trial judge,

and permit his assessment of damages to stand, upon the theory that the defendants did not furnish enough water to mature his crops, although it is equally plain that respondent made but slight effort to use the water that was furnished. He frankly admits that, when he found out how the water was to be furnished, he set about to make a contest and "to see if this contract could be construed that they could dictate to us that we could have water when they gave it. That was my object." The case really turns upon the construction to be given to the following clause in the contract:

"The water company may at its option place and maintain at the point of delivery suitable measuring boxes or gates; the time and mannêr of delivering, measuring and regulating the supply to the purchaser shall be prescribed by the water company and shall be under its control and subject to such rules and regulations as it may from time to time adopt. The water company may shut off water in its pipes or canals at any time that it may deem necessary to do so for the purpose of repairs; and the purchaser for himself and his heirs and assigns agrees to waive and hereby does waive any and all claims for damages resulting either from an insufficient or excessive supply of water, or from break, leakage or overflow."

Under this clause appellants claimed the right to furnish water under what is known as the alternating plan; that is, to maintain a flow for three days, and to shut it off for three days. They accordingly divided the consumers into two groups, and delivered water to one group for three days and then to the other for three days. The plant was not operated on Sunday. There is testimony tending to show that, while the water was furnished, the daily flow was nearly double the amount specified in the contract; so that respondent received approximately the same amount that he would have received under a continuous flow. Respondent maintains that he is entitled to a continuous flow, and is not to be compelled to accept his water in the manner in which it was delivered. He also offered testimony to show that the pumping facilities were inadequate. The trial court found that delivery was not made

in conformity with the contract, and concluded, as a matter of law, that "under and by virtue of said contract said plaintiff shall be entitled to a continuous flow of water from the 1st day of April of each and every year until the 1st day of October, at the rate of one cubic foot of water per second of time for each and every acre of land described in the contract herein mentioned, on payment of maintenance fee specified in said contract."

It is conceded that appellants have the right, under the terms of the contract, to create rules and regulations, but it is contended that such rules must be reasonable and do no violence to the letter or spirit of the contract. The obligations of a private company organized for the purpose of selling arid lands and furnishing water for their irrigation are quasi public, and no arbitrary action under the guise of rules or regulations is to be tolerated. But when rights in such an important element as water is in the arid regions are to be measured by the courts, we cannot lay down a rule that would give to the user an arbitrary right to use water at will. His rights are to be measured by his necessities (provided, of course, he receives the amount agreed to be delivered), and not by any fanciful notion of his own. In construing this class of contracts, courts must bear in mind—for the fact is obvious— that the policy of the nation to convert its deserts into fruitful fields can only be accomplished by conserving that element which alone can give it life. It is upon this principle that the right of common users of water for irrigation to make rules and regulations rests; and it is equally potent to prevent a judicial construction of a private contract which might give an advantage to the landowner, or permit a practice on his part which might lead to a waste of the conserving element.

To confirm our conclusion that such questions cannot be determined as questions of law, it is necessary only to suggest that the theory of irrigation is but imperfectly outlined, and its practice depends on conditions so varied that a fixed rule— the one here contended for—might, in another case work in-

justice to the consumer whose land might be of such quality, or his crops of such character, as to demand that water be furnished intermittently rather than in constant flow. It must not be held, under an open contract, that the user has a right to insist upon any given manner of use. Otherwise the right, to say nothing of the necessity, of prescribing rules and regulations would be of no avail to protect others from that prodigality which has so far marked the progress of the American pioneer. Neither must it be held, in the strict sense, that any one has a right to use water at will. Flowing waters are free to all, and only so far as sanctioned by custom or statute may they be put to private uses. While the cry "There is land for all" has sustained us in our disposition of the public domain, we are met at the outset of our irrigation policies by the fact that there is not, and probably never will be, even with perfect practice, water for all. It has been said that, "The forest and water problems are perhaps the most vital internal questions in the United States." Newell, chief of the division of hydrography of the United States Geological Survey, in his work on Irrigation, notes the fact that there has been but little progress in the practice of irrigation, "due largely to the fact that the men who are now bringing in the lands under ditch have for the most part received their training as farmers in the humid regions, and find it difficult to unlearn many facts which they regard as fundamental." He also notes the varying conditions of the soil—whether it be new or old; the season, whether of greater drought than ordinary; the needs of the various forms of plant life, and the low orders of plant life, "nitrifying organisms," all of which must be considered in determining whether water should be applied constantly or intermittently, and which can frequently be determined only by long-continued study and experiment. He says, at page 216:

"With the gradual development of the country and the bringing of more and more land under ditches, the need for water increases, and equity demands that no irrigator shall

take more than he can put to beneficial use. Flowing water must be considered as a common fund, subject to beneficial use by individuals according to orderly rules, each man taking only the amount he can employ to advantage. Under any other theory full development of arid regions is impossible."

In his instructive work on irrigation, F. H. King, professor of agricultural physics of the University of Wisconsin, on page 234 *et seq.*, indicates that intermittent irrigation is the better if not the proper plan; and Newell, page 180, says:

"It is so much easier to open the ditches and let the water flow freely than it is to guard and guide each tiny rill, that for economy of time and labor, if not from actual indolence, the irrigator is apt to let the water go its way."

And again, at page 215:

"The farmers, being accustomed to the use of large quantities of water, often find it exceedingly difficult to get along with less and continue to use excessive amounts, often to their own disadvantage. They are actuated in part by the consideration that, having paid for the use of the water, they are entitled to a certain quantity, and fear that if they do not take all of this their claim to it may be disputed. Some of them actually waste water to their own detriment from the mistaken belief that in so doing they are establishing a perpetual right to certain quantities."

These general observations may seem irrelevant. They are not put forth as legal propositions, but to illustrate our theory that we cannot declare, as a matter of law, that a regulation or rule of a water company, which provides for an intermittent flow rather than a constant flow, is unreasonable or unjust. Each case must be grounded on its own facts. To further illustrate, it may be that in the next case the character of the soil and other natural conditions would demand that the water be furnished by intermittent flow. In other words, what respondent now insists shall be declared as a fixed rule of law, if applied in another case would work injury to the landowner. *Hewitt v. San Jacinto & P. V. Irr. Dist.*, 124 Cal. 186, 56 Pac. 893, is a case bearing some relation to this one.

A contract, calling for an amount of water equal to one irrigating inch of water to each seven acres, was construed by the court. It was held that a continuous flow was not contemplated, because of the provision that the purchaser should "give notice *when*" he wanted the water. But, in passing, the court suggested that usage and custom may be considered as a means of interpretation of such contracts. Respondent cites this case to sustain the proposition that, it being shown that it was the custom throughout the Yakima valley to deliver water in a continuous flow, we must hold this custom to have been within the contemplation of the parties when the contract was made. The answer to this is that a practice is shown to have existed, but the testimony does not show a custom. On the other hand, it shows a growing tendency to adopt the alternating system which will give water in quantity at stated intervals. Nor does it show a necessity for a continuous flow. The most it does show is, to use the language of one of respondent's witnesses, that "water must be kept running on alfalfa ground nearly continuously until it is rooted." This is sustained by the opinion of an expert witness offered by respondent, who said of his recommendations to another irrigation company:

"That is a system somewhat similar to this one. My report to them was this: That in the beginning of the operation of their plant, it would be necessary to give a continuous flow, but after the crops had gotten started, and any way sufficiently rooted, then a rotation system would be advisable."

But, if it be conceded that a custom was shown, it would not govern a contract permitting the company to adopt reasonable rules and regulations, for custom can fix the manner of use of water for irrigation only when it is founded on necessity; or, to put it in the language of all the cases, an irrigator is entitled to use only so much as he can put to a beneficial use, for the public policy of the people of the United States will not tolerate waste of water in the arid regions.

Aside from all this, we think the evidence of custom in this

case is irrelevant.   The purchaser made his contract knowing that he was depending on a pumping system, and any custom prevailing among the users of a natural flow of waters could not be held to bar the appellants from their right to make reasonable rules and regulations, so long as they furnished the amount of water contracted for under such conditions as the circumstances of the particular case demanded.   In other words, the real question in all cases of this character should be, has the water company furnished the amount of water contracted to be furnished and in such manner as will, under approved methods, considering the natural conditions, insure the raising of crops?   Our conclusion is that respondent is entitled to an amount of water equal to one cubic foot per second of time for each one hundred and sixty acres of land, and that a regulation providing for an intermittent flow is not to be held unreasonable, unless it be shown that appellants did not furnish the amount of water agreed upon.

As we said in the beginning, there is testimony to sustain the trial judge in his finding that there was not enough water so furnished, and for that reason we sustain him in his finding of damages, and allow the amount to be credited on the contract.   No cases have been cited, and we find none, strictly in line with this one.   Whether this be so because of the lack of zeal on the part of counsel or the court, or whether there is in fact no such case, we find no hesitation in holding on principle that water contracts must be held to be mutual, and when disputed they will be construed in the light of the necessities of the parties, rather than with reference to the arbitrary desire of either party.   We, therefore, refuse to hold, as it is earnestly insisted that we should, that under the terms of the contract, respondent is entitled to a continuous flow of water.

This case will be reversed, and remanded with instructions to the lower court to modify its decree to conform to this opinion.

CROW and MORRIS, JJ., concur.